Hearing Date: May 13, 2015
Time: 3:30 p.m.

ROSEN & ASSOCIATES, P.C.
Proposed Attorneys for the Debtor
  and Debtor in Possession
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Ashley M. Koenen

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x

In re                                                            Case No. 15-41173-cec

Community Environmental Center, Inc.,        Chapter 11

                              Debtor.
----------------------------------------------------------x

**NOTICE OF HEARING ON THE DEBTOR'S MOTION**
**FOR THE ENTRY OF AN ORDER APPROVING (I) A**
**SETTLEMENT AGREEMENT BY AND AMONG JP MORGAN**
**CHASE, N.A., COMMUNITY ENVIRONMENTAL CENTER, INC.,**
**AND CEC STUYVESANT COVE, INC., (II) A SETTLEMENT**
**AGREEMENT BY AND AMONG COMMUNITY ENVIRONMENTAL**
**CENTER, INC., BIG INITIATIVES INCORPORATED, AND CEC**
**STUYVESANT COVE, INC., (III) THE SALE OF CERTAIN OF THE**
**DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS, (IV) THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES, AND (V) OTHER RELATED RELIEF**

         PLEASE TAKE NOTICE that upon the motion dated April 14, 2015 (the

"**Motion**") of Community Environmental Center, Inc. (the "**Debtor**"), by its proposed attorneys,

Rosen & Associates, P.C., the undersigned will move at a hearing before the Honorable Carla E.

Craig, Chief United States Bankruptcy Judge, United States Bankruptcy Court, Eastern District

of New York, Conrad B. Duberstein Courthouse, 271-C Cadman Plaza East, Suite 1595,

Brooklyn, NY 11201-1800, on **May 13, 2015 at 3:30 p.m**., or as soon thereafter as counsel can be heard, for the entry of an order, substantially in the form annexed as "Exhibit A" to the Motion, approving (I) a settlement agreement by and among the Debtor, JPMorgan Chase Bank, N.A. ("**Chase**"), and CEC Stuyvesant Cove, Inc. d/b/a Solar One d/b/a Solar 1 ("**Solar One**"), (II) a settlement agreement by and among the Debtor, Solar One, and BIG Initiatives Incorporated ("**BIG Initiatives**"), (III) an asset purchase agreement by and between the Debtor and BIG Initiatives, for (A) the sale of certain of the Debtor's assets free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature, except as expressly provided for in the Asset Purchase Agreement, and the consummation of the transactions contemplated thereby, and (B) the assumption and assignment of certain executory contracts and unexpired leases, and for such other and further relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of New York, shall set forth the grounds with specificity, and shall be filed with this Court electronically in accordance with General Order No. 559 (General Order No. 559 and the User's Manual for the Electronic Case Filing System can be found at www.nyeb.uscourts.gov, the official website for this Court) by registered users of this Court's case filing system, and by all other parties in interest on a 3.5" disk, preferably in PDF or any Windows-based word processing format (with a hard copy delivered directly to the Judge's chambers) and served in accordance with General Order No. 559 upon (i) proposed counsel for the Debtor, Rosen & Associates, P.C., 747 Third Avenue, New York, NY 10017-2803, Attn.: Ashley M. Koenen, Esq., (ii) the Office of the United States Trustee for Region 2, U.S. Federal

Office Building, 201 Varick Street, New York, NY 10014, Attn.: Marylou Martin, Esq.; (iii)

counsel for Chase, Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP, 475 Park Avenue

South, New York, NY 10022, Attn.: Clifford A. Katz, Esq.; (iv) counsel for Solar One, Quinn

Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010,

Attn: Daniel Holzman, Esq.; (v) counsel for BIG Initiatives, Proskauer Rose LLP, Eleven Times

Square, New York, NY 10036-8299, Attn: Judy G.Z. Liu, Esq., and (vi) all other parties in

interest who have requested service, so as to be received no later than seven (7) business days

prior to the Hearing.

Dated: New York, New York
      April 20, 2015

                    ROSEN & ASSOCIATES, P.C.
                    Proposed Attorneys for the Debtor and
                     Debtor in Possession

                    By: /s/ Ashley M. Koenen
                         Ashley M. Koenen
                    747 Third Avenue
                    New York, NY 10017-2803
                    (212) 223-1100

**Hearing Date: May 13, 2015**
**Time: 3:30 p.m.**

ROSEN & ASSOCIATES, P.C.
Proposed Attorneys for the Debtor
  and Debtor in Possession
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Ashley M. Koenen

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x

In re                                                            Case No. 15-41173-cec

Community Environmental Center, Inc.,          Chapter 11

                                        Debtor.
----------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER**
**APPROVING (I) A SETTLEMENT AGREEMENT BY AND AMONG JP**
**MORGAN CHASE, N.A., COMMUNITY ENVIRONMENTAL CENTER,**
**INC., AND CEC STUYVESANT COVE, INC., (II) A SETTLEMENT**
**AGREEMENT BY AND AMONG COMMUNITY ENVIRONMENTAL**
**CENTER, INC., BIG INITIATIVES INCORPORATED, AND CEC**
**STUYVESANT COVE, INC., (III) THE SALE OF CERTAIN OF THE**
**DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS, (IV) THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES, AND (V) OTHER RELATED RELIEF**

Community Environmental Center, Inc. (the "**Debtor**"), by its proposed attorneys,

Rosen & Associates, P.C., pursuant to sections 105(a), 362, 363, 365, 503, 507, and 541(f) of

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004,

6006, 9006, 9007, and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

**Rules**"), as and for its motion (the "**Motion**") for the entry of an order (the "**Approval Order**"),

approving (I) a settlement agreement (the "**Chase Agreement**") by and among the Debtor,

JPMorgan Chase Bank, N.A. ("**Chase**"), and CEC Stuyvesant Cove, Inc. d/b/a Solar One d/b/a

Solar 1 ("**Solar One**") (collectively, the "**Chase Agreement Parties**"), (II) a settlement

agreement (the "**Funding Agreement**") by and among the Debtor, Solar One, and BIG

Initiatives Incorporated ("**BIG Initiatives**") (collectively, the "**Funding Agreement Parties**,"

and together with Chase, the "**Parties**"), (III) an asset purchase agreement (the "**Asset Purchase**

**Agreement**"), by and between the Debtor and BIG Initiatives (collectively with its designees and

assignees as contemplated under the Asset Purchase Agreement, the "**Buyer**"), for (A) the sale

(the "**Sale**") of certain of the Debtor's assets (the "**Acquired Assets**") free and clear of all liens,

claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations,

liabilities, contractual commitments or interests of any kind or nature, except as expressly

provided for in the Asset Purchase Agreement (collectively, the "**Liens**"), and the consummation

of the transactions contemplated thereby (the "**Transactions**"), and (B) the assumption and

assignment of certain executory contracts and unexpired leases (such executory contracts and

unexpired leases that are proposed to be assumed and assigned pursuant to the Asset Purchase

Agreement, the "**Assumed Contracts and Leases**"), respectfully represents:

## PRELIMINARY STATEMENT

1.      For over twenty years, the Debtor, a not-for-profit organization, has

developed programs for the New York City community to address the connection among

environmental issues, inner city neighborhoods, and existing buildings.  Due to a reduction in

government funding and other circumstances beyond its control, the Debtor can no longer afford

to operate all of its programs; only one such program, Build It Green! NYC ("**Build it Green**"),

a donation center and retail outlet for salvaged building materials, continues to operate and

generate income for the Debtor.

2.      The Debtor's largest creditor is Chase, which, as of the Petition Date, was

owed approximately $1.8 million.  Approximately $1.3 million of the Debtor's debt to Chase is

on account of direct loans to the Debtor, and the remaining $500,000 is on account of the

Debtor's guaranty of a direct loan to Solar One, an independently operated domestic not-for-

profit corporation whose sole membership interest is held by the Debtor.

3.    Solar One is also indebted to Chase for the same $1.8 million on account

of its direct loan and guaranty of the Debtor's obligations.  In addition to the debts owed to

Chase, as of the Petition Date, Solar One owed the Debtor $284,384.39 for numerous

intercompany payables (collectively, the "**Intercompany Payable**").  Chase's claims are secured

by security interests in, and liens on, substantially all of the property of CEC and Solar One,

including the Intercompany Payable.

4.    In September 2014, Chase filed a lawsuit for $1.8 million against the

Debtor and Solar One on account of their respective direct loans and guarantees.  Since that time,

the Debtor, Solar One, and Chase have been engaging in settlement negotiations.  During the

course of these negotiations, the Debtor communicated its intention to file bankruptcy and its

desire to preserve the Build it Green program for the New York City community and to ensure

its key operations can continue in some form without interruption, albeit through a new,

standalone, independent, unaffiliated, not-for-profit corporation.  Solar One, in turn,

communicated its desire to continue operating its business without the Debtor.

5.    After six months of extensive deliberation, the Parties reached a global

settlement, which they memorialized in three, interrelated, separate agreements: the Chase

Agreement, the Funding Agreement, and the Asset Purchase Agreement (collectively, the

"**Agreements**").  The global settlement accomplishes three main objectives: (1) it settles and

releases Chase's claims against the Debtor and Solar One, and Solar One and the Debtor's claims

against one another; (2) it terminates the Debtor's membership interest in Solar One, which

allows Solar One to continue operating as an independently managed and funded entity, free of certain liens and encumbrances; and (3) it approves the sale of certain of the Debtor's Build it Green program assets to BIG Initiatives (which intends to benefit the New York City environmental community by offering many of the same services as the Build it Green program), and the assumption of certain of CEC's obligations under the Assumed Contracts and Leases.

6. Chase has accepted an offer to settle its claims against both the Debtor and Solar One for $350,000 (the "**Settlement Amount**"), whereby Solar One would pay $250,000 and the Debtor would pay the balance of $100,000 pursuant to the terms and conditions set forth in the Chase Agreement, which is attached hereto in substantially final form as **Exhibit B**.

7. The mechanisms by which the Debtor and Solar One will fund the Settlement Amount are set forth in the Funding Agreement, which is attached hereto in substantially final form as **Exhibit C**.  In addition, the Funding Agreement, among other things, provides mutual releases by and between the Debtor and Solar One, and provides for the Debtor's sale of certain of its Build it Green program assets to BIG Initiatives under the terms and conditions set forth in the Asset Purchase Agreement.

8. Solar One secured funding to pay its share of the Settlement Amount from a third-party lender, which has conditioned such payment on entry of the Approval Order, whereby Solar One would be, among other things, released from all claims, liens, encumbrances, and membership interests of the Debtor and Chase.  Absent the third-party funding, Solar One would not have the funds available to pay its portion of the Settlement Amount.

9. The Debtor lacks the funds to pay its portion of the Settlement Amount. To make its payment to Chase, the Debtor must sell certain of its Build It Green program assets. The most recent appraisal of the Debtor's assets, which was commissioned by Chase in October 2014, showed that after accounting for the projected liquidation costs and expenses, the Debtor's

assets were worth less than $0.

10.     BIG Initiatives, as discussed more fully below, has offered to purchase certain of the Debtor's Build it Green program assets, for $75,000, and assume the Debtor's obligations under the Assumed Contracts and Leases, pursuant to the terms and conditions set forth in the Funding Agreement and the Asset Purchase Agreement, which is attached hereto as **Exhibit D**.

11.     By this Motion, the Debtor seeks this Court's entry of the Approval Order, attached hereto as **Exhibit A**, whose terms, if entered, will approve the Agreements.  Together, the Agreements constitute one global settlement among the Parties; the effectiveness of each is dependent and conditioned upon the effectiveness of the others.  For this reason, the Debtor believes that the combined nature of the relief sought by this Motion is reasonable and necessary under the circumstances.

12.     At the time this Motion was filed, Chase had not yet approved the final form of the Chase Agreement, but consented to its material terms and to the filing of this Motion in the interest of time.  The Parties expect that the Chase Agreement, or an agreement in substantially the same form, will be approved by the date of the hearing on this Motion.  All other agreements and documents submitted with this Motion have been reviewed and approved by the Debtor, Solar One, and/or BIG Initiatives, as the case may be.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction to consider this Motion and the Transactions pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this district

pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Bankruptcy Case

14.    On March 19, 2015 (the "**Petition Date**"), the Debtor commenced in this Court a voluntary case under chapter 11 of the Bankruptcy Code.

15.    The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  To date, no trustee, examiner, or committee of unsecured creditors has been appointed in this chapter 11 case.

### The Debtor's Business

16.    The Debtor is a domestic not-for-profit corporation formed under and pursuant to the laws of the state of New York.  The Debtor was founded in 1994 by Richard M. Cherry, who served as its President and Chief Executive Officer until September 26, 2014.  The Debtor was the first not-for-profit organization in New York City to implement energy efficiency programs for housing and community development.  The Debtor grew to become the largest supplier of weatherization services under New York State's Weatherization Assistance Program ("**WAP**"), an approved provider of the energy efficiency programs of the New York State Energy Research and Development Authority, and a pioneer in the use of cellulose insulation and solar hot water systems in New York City buildings.

17.    From 1994 to 2011, the Debtor retrofitted 17,752 housing units through WAP.  From 2010 to 2011, the Debtor brought weatherization to an additional 9,611 low-income families through the American Recovery and Reinvestment Act.

18.    As a domestic not-for-profit corporation, the Debtor receives the majority of its funding from state and federal grants.  At its peak in 2012, the Debtor received nearly $30 million in grants and employed over 200 people.  In 2013, however, the federal funds available

6

to environmental programs were cut drastically, and the Debtor received only $3 million in grant funds for the year.  This reduction in funding had devastating effects on the Debtor's operations. From 2013 to 2014, the Debtor was forced to lay off over 170 employees and scale back its programs to match its limited resources.

19.    Although the Debtor attempted to reorganize and continue operations on a smaller scale, it reached a breaking point when New York State Homes and Community Renewal, one of its key remaining partners, cancelled its contract with the Debtor. Consequently, the Debtor could no longer afford to pay the rent for its offices located at 22-09 Queens Plaza North, Long Island City, NY 11101 and it was subsequently evicted from that space.  As of December 8, 2014, the Debtor's books and records reflect total assets of approximately $815,000 and total liabilities of approximately $5.3 million.

**Solar One and Build it Green**

20.    Although most of the Debtor's affiliates and programs have ceased operations, Solar One and the Build it Green program continue to operate.

21.    Solar One runs programs that deliver environmental education programing to New Yorkers of all ages.  It also manages Stuyvesant Cove Park, an architect-designed, sustainably managed two-acre park on land that was once an abandoned industrial site. Stuyvesant Cove Park now is home to hundreds of indigenous plants, flowers, trees, and berry bushes, and a site for many free public events.

22.    The Debtor holds the sole membership interest in Solar One.  However, given that Solar One is a not-for-profit corporation, this equity interest has no economic value. The only value of this membership interest is that it provides the Debtor certain voting and governance rights with respect to Solar One.

23.    The Build it Green program runs a retail outlet for salvaged and surplus

building materials.  It accepts donated building materials and sells them to the public for a deeply

discounted price, which reduces greenhouse gases by keeping materials out of the waste system.

The program operates out of two warehouse locations leased by the Debtor: (a) 3-17 26th Ave.,

Queens, NY 11102; and (b) 69 9th St., Brooklyn, NY 11215 (together, the "**Warehouses**").

**Chase's Claims**

24.    Chase is the Debtor's largest creditor.  As of the Petition Date, the Debtor

owed Chase approximately $1.8 million, which is secured by liens on substantially all of the

property of CEC.  Approximately $1.3 million of the Debtor's debt to Chase is on account of

direct loans to the Debtor, and the remaining $500,000 is on account of the Debtor's guaranty of

a direct loan to Solar One, an independently operated domestic not-for-profit corporation whose

sole membership interest is held by the Debtor.  Solar One is also indebted to Chase for the same

$1.8 million on account of its direct loan and guaranty of the Debtor's obligations.  In addition to

the debts owed to Chase, as of the Petition Date, Solar One owed the Debtor $284,384.39 on

account of the Intercompany Payable.

25.    Pursuant to a Commercial Security Agreement dated September 20, 2011,

the Debtor granted Chase a blanket first priority security interest in all of its personal property to

secure its obligation to repay its loan from Chase and its obligations as a guarantor of Chase's

loan to Solar One.  Pursuant to a Commercial Security Agreement dated September 20, 2011,

Solar One granted Chase a blanket first priority security interest in all of its personal property to

secure its obligation to repay its loan from Chase and its obligations as a guarantor of Chase's

loans to the Debtor.  Due to this cross-collateralization, Chase's claims are secured by security

interests in, and liens on, substantially all of the property of CEC and Solar One, including the

Intercompany Payable.

26.    On September 26, 2014, Chase commenced an action in the Supreme

Court of the State of New York, County of Queens against the Debtor and Solar One, alleging various claims based on their failure to meet their respective obligations under the loan agreements and commercial guarantees titled *JP Morgan Chase Bank, N.A. v Community Environmental Center, Inc. d/b/a Build it Green, and CEC Stuyvesant Cove, Inc. d/b/a Solar One d/b/a Solar 1* (No. 706971/2014) (the "**Action**").

27.    On October 29, 2014, Chase commissioned an appraisal on all of the Debtor's assets.  The appraisal valued the Debtor's assets for $55,919.50 before accounting for projected liquidation costs and expenses, and at less than $0 after accounting for such costs and expenses.  This is attributable to, among other things, the nature of the Debtor's assets, the majority of which are donated building materials, equipment, and machinery.  Moreover, a portion of the Debtor's assets contain donor-imposed restrictions on their use, such that they can only be used for a particular project or specific purpose, and cannot be sold on the open market.  A full list of these restricted assets can be found on "Exhibit A" to the Asset Purchase Agreement.

28.    After due deliberation and in consideration of the Debtor's and Solar One's respective financial conditions, Chase has accepted an offer to settle its claims against both the Debtor and Solar One for the Settlement Amount of $350,000, under the terms of and conditions set forth in the Chase Agreement, whereby Solar One would pay $250,000 and the Debtor would pay the balance of $100,000.

29.    Solar One procured funding from a third-party lender that has offered to loan Solar One the $250,000 to pay its portion of the Settlement Amount on the condition that the Agreements are approved by this Court and the Approval Order is entered.  In effect, the lender will not fund Solar One's share of the Settlement Amount unless and until Solar One is an independently-operated and managed entity, unencumbered by certain prior claims, liens, and

9

obligations that are related or attributable to its relationship with the Debtor.

**The Sale**

30.     To pay its share of the Settlement Amount, the Debtor must sell certain of its Build It Green program assets.  As discussed above, however, the Debtor's assets would be essentially valueless in a public sale.

31.     BIG Initiatives, a new not-for-profit corporation started by a non-insider employee of the Debtor, wishes to provide for the New York City community certain of the substantial environmental benefits that the Debtor has been providing through its Build it Green program.  To ensure that this program can continue without interruption, BIG Initiatives has offered to purchase for $75,000 certain Build it Green program assets, which are identified as the Acquired Assets on "Exhibit A" to the Asset Purchase Agreement, and assume certain of the Debtor's unexpired contracts and leases, which are identified as the Assumed Contracts and Leases on "Exhibit B" to the Asset Purchase Agreement.

32.     The Assumed Contracts and Leases include the rental leases for the Warehouses and a purchase agreement for the use of certain equipment.  As of the Petition Date, the Debtor owed approximately $93,000 on account of the Assumed Contracts and Leases.  Specifically, it owed $56,700 in back rent for its lease of the warehouse located at 3-17 26th Astoria Avenue, and $34,000 under the terms of its equipment purchase agreement.  As of the Petition Date, the security deposits of the rental leases for the Warehouses aggregated $92,000 and were being held with the respective landlords of the properties.  Under the terms of the Asset Purchase Agreement, BIG Initiatives will retain the Debtor's interest in these security deposits, cure the approximately $93,000 of back rent and contractual obligations, and continue to satisfy the ongoing rent and other obligations under the Assumed Contracts and Leases on a going

forward basis.

33.     Given the low appraised value of the Acquired Assets and the Assumed Contracts and Leases, Chase has approved BIG's purchase offer on the condition that the $75,000 sale proceeds, plus $25,000 of cash on hand, be remitted to Chase in payment of the Debtor's share of the Settlement Amount.

34.     The Sale to BIG Initiatives is reasonable and necessary under the circumstances, as the Acquired Assets and the Assumed Contracts and Leases would have little, if any, value in a public sale.  Furthermore, even if the assets could be sold for a higher price, the only creditor that would stand to benefit would be Chase, because it is owed $1.8 million and has a perfected security interest in all of the Debtor's assets.  Accordingly, a higher sale price would not benefit the Debtor's estate.  Finally, absent BIG Initiatives' assumption of the obligations under the Assumed Contracts and Leases, the Debtor would be constrained to reject these agreements, resulting in the landlords and contract counterparties asserting on an aggregate basis substantial rejection claims against the Debtor's estate.

### THE CHASE AGREEMENT
### AND THE FUNDING AGREEMENT

**I.     The Chase Agreement**

35.     The Chase Agreement is the product of extensive, good faith, and arms-length negotiations among the Chase Agreement Parties.  The Chase Agreement settles Chase's claims against the Debtor and Solar One, all claims asserted in the Action, and provides releases by and among each of the Chase Agreement Parties.

36.     The principal terms of the Chase Agreement are as follows:

    a.  CEC and Solar One shall pay to Chase the total sum of $350,000, with
        each Party paying the following sums: (1) CEC: $100,000; and (2)

Solar One: $250,000.

b. Each of CEC and Solar One shall pay 50% of the total amount of the reasonable fees and expenses of counsel for Chase incurred in connection with this settlement and the bankruptcy proceeding, provided that such total amount does not $20,000, and if such total amount does exceed $20,000, Solar One's payment shall be limited to $10,000 and CEC shall pay the remaining amount.

c. The Debtor and Solar One shall remit their portions of the Settlement Amount to Chase within five (5) business days following the entry of an order granting the relief sought in this Motion.

d. Simultaneously with the payment of the Settlement Amount to Chase, CEC shall assign and transfer to Chase the Intercompany Payable. Immediately following Chase's receipt of the Settlement Amount and in consideration thereof, Chase shall forever release and discharge the Intercompany Payable and no further payments or obligations shall be due or may become due with respect to the Intercompany Payable.

e. Within three (3) business days following its receipt of the Settlement Amount, Chase shall terminate its Liens on the property of Solar One and on the assets and executory contracts of CEC that are to be sold and assigned to BIG Initiatives under the Asset Purchase Agreement.

f. Upon the entry of an order granting the relief sought in this Motion, Chase shall fully release and discharge Solar One.

37.    The Chase Agreement further provides that Chase will assign and transfer to the Debtor or its designee the full amount of its claims against the Debtor, after deducting the Settlement Amount, together with its Security Interest in the Debtor's Property.  The transfer of this interest back to the Debtor or its designee preserves these liens for the benefit of its estate.

## II.    **The Funding Agreement**

38.    The Funding Agreement is also the product of extensive, good faith, and arms-length negotiations among the Funding Agreement Parties.  The Funding Agreement provides the procedures and mechanisms by which the Debtor and Solar shall fund their respective payment obligations under the Chase Agreement, provides mutual releases by and

between the Debtor and Solar One, and provides for the Debtor's sale of certain of its assets to

BIG Initiatives under the Asset Purchase Agreement.

39.    The principal terms of the Funding Agreement are as follows:

a.    CEC and Solar One shall pay to Chase the total sum of $350,000, with each Party paying the following sums: (1) CEC: $100,000; and (2) Solar One: $250,000.

b.    Pursuant to the terms and conditions of the Asset Purchase Agreement, BIG Initiatives shall pay $75,000 to CEC, which CEC shall, in turn, remit to Chase in partial payment of its $100,000 payment under the Chase Agreement.

c.    The Debtor and Solar One shall remit their portions of the Settlement Amount to Chase within five (5) business days following the entry of an order granting the relief sought in this Motion.

d.    Upon the entry of an order granting the relief sought in this Motion, Solar One and the Debtor shall fully and mutually release and discharge each other.

e.    Upon the entry of an order (i.e., the proposed Approval Order) granting the relief sought in this Motion, CEC shall terminate its membership interest in Solar One.

40.    The Funding Agreement further provides that it shall terminate upon the

entry of an order of this Court denying this Motion.

**III.    Relief Requested Related to the
Chase Agreement and the Funding Agreement**

41.    As part of this Motion, the Debtor seeks (i) approval of the Chase

Agreement and the Funding Agreement pursuant to section 105(a) of the Bankruptcy Code and

Bankruptcy Rule 9019 and (ii) related relief.

**IV.    Basis for Relief Requested Related to the
Chase Agreement and the Funding Agreement**

42.    Bankruptcy Rule 9019(a) provides that upon motion and after notice and a

hearing, "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In

13

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–425 (1968), the Supreme Court held that the approval of a compromise or settlement requires a determination by the bankruptcy court that it is fair and equitable. Such approval also requires a determination that the compromise or settlement is in the best interests of the estate. *Geltzer v. The Original Soupman Inc., et al (In re Soup Kitchen International)*, 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014).

      43.    In this Circuit, courts have developed "standards to evaluate if a settlement is fair and equitable, and, to that end . . . have set forth factors for approval of settlements based on the original framework announced in *TMT Trailer Ferry*." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. ____) (internal citations omitted). These factors are as follows:

    a.    the balance between the litigation's possibility of success and the settlement's future benefits;

    b.    the likelihood of complex and prolonged litigation, including the expense, delay, and difficulty in collecting on the judgment;

    c.    the interests of creditors, including whether they support the settlement;

    d.    whether other parties in interest support the settlement;

    e.    the competency and experience of the attorneys supporting the settlement;

    f.    the nature and breadth of releases to be obtained by officers and directors; and

    g.    whether the settlement is the result of arm's length

bargaining.

*In re Iridium Operating LLC*, 478 F.3d at 462.

44.    It is well settled that "[a] bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement . . . . It is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute." *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y.2010) (citations omitted).  Rather, in determining the fairness and reasonableness of a settlement, the court need only "canvass the issues" to determine if the "settlement falls below the lowest point in the range of reasonableness." *In re Teltronics Serv., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985).

45.    Here, the Debtor can easily satisfy its burden to demonstrate that, taken together, the global settlement represented by the Chase Agreement, the Funding Agreement and Asset Purchase Agreement is fair, equitable, and in the best interest of its estate.  Under the terms of the Chase Agreement and the Funding Agreement, the Debtor will pay $100,000 and Solar One will pay $250,000 to settle Chase's $1.8 million claim against them, and their claims against one another.  The Chase Agreement and the Funding Agreement also settle the Action, which saves the Debtor from paying the cost and expenses of defending against Chase's collection efforts as well as the cost and expenses of prosecuting a contribution claim against, or defending such claim from, Solar One, as the case may be.

46.    Viewed in light of the factors enumerated by the Second Circuit, the facts and circumstances underlying the Chase Agreement and the Funding Agreement, this Court should grant the relief requested.

## THE ASSET PURCHASE AGREEMENT

47.    The Asset Purchase Agreement is the product of extensive, good faith, and

arms-length negotiations between the Debtor and the Buyer.  The principal terms of the Asset

Purchase Agreement are as follows:

    a.  The purchase price is $75,000, which will be held in escrow by the Debtor's counsel and remitted to Chase pursuant to the terms and conditions of the Funding Agreement.

    b.  On the Closing Date, the Debtor shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase, accept, assume and take delivery from the Debtor, all right, title, and interest of the Debtor in and to the Acquired Assets, which are listed on "Exhibit A" to the Agreement, free and clear of all Liens, upon the terms and subject to the conditions set forth in the Agreement.

    c.  On the Closing Date, the Debtor shall assign to Buyer, and Buyer shall accept and assume from the Debtor, all right, title, and interest of Seller in the Assumed Contracts and Leases, which are listed on "Exhibit B" to the Agreement, all free and clear of all Liens, upon the terms and subject to the conditions set forth in the Agreement.

    d.  The Sale does not include certain Excluded Assets, which are delineated in Section 2.3 of the Agreement.

    e.  The Buyer shall assume certain specified Assumed Liabilities associated with its assumption of the Assumed Contracts and Leases.

    f.  The Buyer shall not assume certain Excluded Liabilities, as set forth in Section 2.6 of the Agreement.

## I.    Relief Requested Related to<br>    <u>The Asset Purchase Agreement</u>

    48.    By this Motion, the Debtor further seeks (i) approval of the Asset

Purchase Agreement, which sets forth the terms and conditions of the Debtor's sale of the

Acquired Assets and the assignment of the Assumed Leases and Contracts to the Buyer, pursuant

to sections 105(a) 362, 363, 365, 503, 507, and 541(f) of the Bankruptcy Code and Rules 2002,

6004, and 6006 of the Bankruptcy Rules, and (ii) related relief.

**I.    Basis for Relief Requested Related
       To The Asset Purchase Agreement**

   **A.    The Sale of the Acquired Assets is within the Sound
          Business Judgment of the Debtor under Section 363(b)**

       49.    Section 363(b) of the Bankruptcy Code permits a debtor to use estate

property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. §

363(b)(1).

       50.    Courts in the Second Circuit, and elsewhere, generally require that

decisions to sell or use property pursuant to section 363(b)(1) be based upon the sound business

judgment of the debtor.  *See, e.g.*, *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d

380, 387 (2d Cir. 1997).  In addition to the notice and hearing requirements set forth in section

363 of the Bankruptcy Code, the Court of Appeals for the Second Circuit has adopted the widely

followed and liberal "business justification test" that is applied where a debtor seeks to sell all, or

substantially all, of its assets prior to confirmation of a plan of reorganization.  *See, e.g.*, *Comm.*

*of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

If a debtor puts forth such a sound business purpose, a presumption arises that the debtor's

decision was made on an informed basis, in good faith, and in the honest belief that the action

was in the debtor's best interest.  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

       51.    The business judgment rule applies in chapter 11 cases.  *See Integrated*

*Res.*, 147 B.R. at 656 (noting that "Delaware business judgment rule principles have 'vitality by

analogy' in Chapter 11"); *see also Comm. of Asbestos-Related Litigants and/or Creditors v.*

*Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y.

1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption

17

of reasonableness attaches to a Debtors' management decisions.").

52.     The Debtor has determined, in the sound exercise of its business judgment, that sale of the Acquired Assets, and assumption and assignment of the Assumed Contracts and Leases to the Buyer under the terms and conditions set forth in the Asset Purchase Agreement is necessary for the Debtor to fund the Chase Settlement and effectively carry out its business in chapter 11.  As discussed above, the Buyer's offer to purchase the Acquired Assets is significantly higher than their appraised value.  Moreover, this offer was approved by Chase, which is the only Party that stands to benefit from a higher or better offer due to the amount of its secured claim and lien on the Debtor's assets.  Additionally, by assuming the obligations under the Assumed Contracts and Leases, the Debtor's estate will not have to bear the additional substantial rejection claims that would otherwise result if the outstanding obligations under these agreements were not cured and assumed.  Accordingly, the Sale is supported by ample business reasons and therefore justified by section 363(b).  *See Ionosphere Clubs, Inc.*, 98 B.R. at 175.

      **B**.     **Request for Approval of the Sale Free
                And Clear of Claims, Liens, and Encumbrances**

53.     The Debtor requests this Court's authorization, pursuant to section 363(f) of the Bankruptcy Code, to sell the Acquired Assets free and clear of any claim, lien, encumbrance, security interest, or restriction on transfer (collectively, the "**Liens**") that may be asserted, with such Liens to attach to the net proceeds of the sale.

54.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest, or encumbrance in such property if:

      (1)     applicable non-bankruptcy law permits the sale of such property free and

clear of such interest;

(2)    such entity asserting such a lien, claim or interest consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity asserting such a lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

55.    Here, the Debtor has obtained the consent of the Chase to sell the

Acquired Assets free and clear of its Liens.

### C.    The Buyer is a Good Faith Buyer Pursuant to Section 363(m)

56.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.    Although the Bankruptcy Code does not define "good faith," the Court of

Appeals for the Second Circuit, in *In re Gucci*, held that the good faith of a purchaser is shown

by the integrity of his conduct during the course of the sale proceedings; where there is a lack of

such integrity, a good faith finding may not be made.  *Licensing By Paolo, Inc. v. Sinatra (In re*

*Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997).  The *In re Gucci* court provided that "the good-faith

requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or

control the outcome of the sale." *Id.*

58.     Here, the Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Buyer is a standalone not-for-profit corporation formed by a former employee of the Debtor.  Notably, the Buyer is not an "insider" as defined in section 101(31) of the Bankruptcy Code.  The Buyer was formed with the intention of preserving for the New York City community certain of the substantial environmental benefits that the Debtor has been providing through its Build it Green program.  The Buyer offered to purchase the Acquired Assets and to assume the Assumed Contracts and Leases in an effort to ensure that the Build it Green program will continue without interruption.  The Buyer has fully cooperated with Chase, Solar One, and the Debtor during the negotiation of the Agreements, and it made its offer to the Debtor in good faith in an arms-length transaction.

59.     Accordingly, the Buyer is entitled to the protection of section 363(m) of the Bankruptcy Code.

> **D.     The Assignment and Assumption of the Assumed Contracts and Leases is a Proper Exercise of the Debtor's Business Judgment under Section 365**

60.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon a finding that a debtor has exercised proper business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996).

61.     The assumption and assignment of the Assumed Contracts and Leases to the Buyer is in the best interest of the Debtor's estate and a proper exercise of the Debtor's

business judgment.  In addition to facilitating the global settlement memorialized in the Agreements, the Buyer will be curing approximately $93,000 in back rent and other debt for the Assumed Contracts and Leases, which serves to both benefit the estate and enable the original, laudable objectives of the Build it Green program to benefit the New York City community, albeit through a new, independent not-for-profit entity.  As noted above, the assumption and assignment also avoids substantial rejection damages that would otherwise accrue if the leases and contracts comprising the Assumed Contracts and Leases were to be rejected.

62.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract if "adequate assurance of future performance by the assignee of such contract . . . is provided, whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re Natco Indus., Inc*., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

63.    The Buyer fully intends to meet its obligations and assume all liabilities associated with its assumption of the Assumed Contracts and Leases under the terms set forth in the Asset Purchase Agreement (and Funding Agreement).  As adequate assurance of such future performance, the Debtor and the Buyer are prepared to demonstrate to the Court at the hearing on this Motion that the Buyer has the financial ability to meet such obligations.

64.    For these reasons, the Debtor seeks the Court's approval to assume and

assign the Assumed Contracts and Leases to the Buyer in accordance with the terms and conditions set forth in the Asset Purchase Agreement.

## NOTICE

65.     The Debtor has served this Motion and the prefixed notice of hearing on: (a) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, New York, NY 10014, Attn.: Marylou Martin, Esq.; (b) counsel for Chase, Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP, 475 Park Avenue South, New York, NY 10022, Attn.: Clifford A. Katz, Esq.; (c) counsel for Solar One, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Daniel Holzman, Esq.; (d) counsel for BIG Initiatives, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036-8299, Attn: Judy G.Z. Liu, Esq.; (e) the Debtor's 20 largest unsecured creditors; (e) any official committee of unsecured creditors appointed in this case; and (f) all persons who have filed a request for notice and service of papers in this case.  The Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

66.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that this Court: (i) enter the proposed Approval Order granting the relief sought herein; and (ii) grant it such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       April 20, 2015

22

ROSEN & ASSOCIATES, P.C.
Proposed Attorneys for the Debtor and
 Debtor in Possession

By: /s/ Ashley M. Koenen
        Ashley M. Koenen

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100